Good morning Your Honor, Giacomo Giacobbe on behalf of Mr. Giacobbe Bhandari, the petitioner in this case. Mr. Bhandari's case has three significant issues before this court. Number one, the BIA abused his discretion and made at least two legal errors in denying the motion to reopen. First, it is our contention that the BIA abused his discretion in denying Mr. Bhandari's motion to reopen the proceedings instead of reversing the IJ's order denying all three forms of relief. This is based, it is based its decision in the requirement that we believe is incorrect. And that is that Mr. Bhandari failed. He had to first raise the ineffective assistance of counsel issue in his appeal brief when filed on July 28, 2006. And instead, he first presented it in his brief in support of the motion to reopen filed on October 12, 2006. Well, the BIA is our position that the BIA has limited authority and cannot create new procedural requirements for relief. Please see Federico, 2010 case. There is nothing in the law, statute or regulations that we see that would give the BIA such broad authority. This ruling by the BIA is nothing short of breathtaking. The second legal error that the BIA made is that Mr. Bhandari was not prejudiced by the ineffective assistance of counsel. This is also simply incorrect. The standard for such finding is squarely outlined in the matter of Lozada where Mr. Bhandari satisfied all three prongs and provided new evidence in support which the BIA chose to disregard. See the administrative record 34. Furthermore, the language for the finding of prejudice can be found in the performance of the prior counsel. And as the ruling states on the matter of Lozada, it may have affected the outcome of the case. The language is pretty clear and it does not contain must, should or shall. Moreover, quote-unquote due diligence only applies to the equitable tolling cases whereas the motion to reopen was filed in this matter clearly within the statutory 90-day period. HCFR section 1003.2. In addition, the BIA mistakes the records when it concludes that the new counsel present here with me, Ms. Tatiana Edwards, discovered the prior counsel, Mr. Gupta's mistakes while preparing her BIA appeal brief. This is only partially correct. Counsel, can I ask you, on the asylum application, are you contending that there was a legally competent excuse for his failure to file within one year? No, I was going to come to that. I was going to come to the one year. So you concede that the asylum issue is kind of off the table? Obviously, Your Honors, but we can come to that. Well, come to it. We can come to it in view of changed circumstances. We believe Mr. Bandeli can successfully make the showing of changed circumstances which will assist him in having the requirement of the one year deadline being met. And what are those changed circumstances? The changed circumstances are the, we are motioning this court to take judicial notice of the issue of the political condition in Nepal. We believe that such motion is warranted for two reasons. Gafur is a binding precedent in this circuit and substantially is very similar on the facts to Mr. Bandeli's claim of a well-founded fear. Well, Counsel, you're talking about two different things here. One is the timeliness of his application for asylum. It has to be done within a year unless there's a legal excuse to the contrary. As I understand it, he has cited examples of conditions that all seem to have occurred prior to his leaving Nepal. He also cites the 2005 country report, which doesn't change anything. He can't cite the 2006 country report because that's not part of the record. We don't retroactively go back and augment the record on things that weren't placed in the record. So what I'd like your help on is, is there any basis other than the two that I just talked about that you're relying upon to claim that your client is entitled to file his application for asylum after the one-year period? Well, we have very strong changed country conditions where, in 2005 already, the king ceded power to the parliament and let the Marxist, Leninist, and Maoist parties... What does that have to do with your client? My client, Your Honor, as the record shows, was a local party leader of the Democratic Party of Nepal. I understand that, but what was done to him? Well, Your Honor, he is... And that all happened prior to the time that he left Nepal, right? Some of it happened prior to the time that he left Nepal, and then there were very strong changed country conditions that made him want to file for asylum here, Your Honor, such as the dissolution of the kingdom, the resolution of the king, king's power, the admittance into parliament of the Marxist, Leninist, and the Maoist parties, which had the plurality in parliament, and he was targeted as the party leader of... Counsel, I don't think we're communicating. You're telling me about things that happened in Nepal. Your client came into the United States. He did not file for asylum within the one-year period. The question is, what legal basis does he have for filing after the one year? What went on in Nepal before he left, or indeed what was going on in Nepal after he left, is irrelevant to this point. Your Honor... What can you cite to me that excuses his filing? This court has the authority to review the matter as a mixed question of fact and law under the substantial evidence standard, which we can see Wakari v. Holder. We believe that Mr. Bhandari can successfully make the showing of changed circumstances, which would assist him in having the statutory requirement of having met the one-year deadline waived due to founded fear under the clear probability for the purposes of withholding of removal claim. The government is incorrectly attempting to base its opposition on Altawil, the 1999 case, which addresses the procedural aspect of the evidence omission, which has nothing to do with the substance of the well-founded fear of persecution claim, and moreover, was overruled by Gafur in 2000. We urge this court to follow the holding in Gafur, and not to ignore the realities of today in arriving at the correct decision by taking the judicial notice of the current country conditions of the Maoist party occupying the seats, the plurality of the seats in the assembly, and the ongoing gross human rights abuses actively committed by the Maoists against people like Mr. Bhandari. Once you do, Mr. Bhandari then can make the showing of changed country conditions to allow this one-year filing bar to be waived. While Mr. Bhandari was in the United States, things were changing very fast and very dramatically in Nepal. We believe that Mr. Bhandari qualifies for asylum relief. Mr. Bhandari meets the burden that at least 10% reasonable possibility showing of past persecution giving the presumption of a well-founded fear of persecution. The government never preferred any evidence that the country condition changes to such a degree that a presumption of a well-founded fear may be overcome. In fact, we are introducing evidence to the country conditions in our motion for judicial notice. Also, Mr. Bhandari qualifies for withholding relief based on his imputed political opinion and membership in a disfavored group. The law has evolved in this area, and the recent decisions in Wakare 2009 and Tampabulon 2010 provides a comprehensive review of the disfavored group analysis which is pertinent to Mr. Bhandari's claim of relief. We will be happy to brief the court on this issue via supplemental briefings. Mr. Bhandari, at the very least, should be considered a high-ranking member of a disfavored political party in Nepal, the Nepalese Congress Democratic Party, and Maoist rebels from the Communist Party of Nepal have routinely persecuted the members of that party with impunity. What evidence is there, any evidence, that shows that your client was persecuted? Not anybody else, your client. Prior to coming to the United States, he was targeted. He ran a successful business for 15 years, intercity bus business. His bus was bombed. Yeah, because he brought the strike. There was a strike, and he operated the bus. That has nothing whatsoever to do with the political party. Well, if you take everything together, your honor, it has a lot to do, we feel, because he was targeted as a member of a disfavored group. He was a class enemy as being the president of a non-communist, non-collectivist party. As such, he was a class enemy to be either taken, converted to your side, or to be eliminated. And he had to literally flee the country in fear without seeing his family again. And as we know, the events gave him right, because shortly after that, the king ceded power, and the Marxist, Leninist, and the Maoist party sat in power, and then the gross human abuses continued unabated. And it's easy to imagine that had he remained in Nepal, he would have been one of the first persons to be targeted and to be eliminated once the Maoists were now firmly in power, and they were the authority as the party having plurality in the parliament. So he was a capitalist. He was a non-communist, your honor. He believed in... He was a capitalist. Yes, your honor. I mean, he believed that... In the good sense of the word, your honor, of the term. Well, you know, whatever... He refused to be a collectivist. He refused to... He believed in democracy, your honor. And they'd come around, the Maoists would come around asking for money from time to time, and they threatened to harm him if he didn't give them money. Was that part of the testimony? Yes, your honor. And that the Maoists targeted successful people like himself and asked them for money. Did he testify to that? Yes, your honor. But, your honor, during the case in chief, the translation was very bad. It's in the record. And the IJ could hardly understand anything that Mr. Bandari was testifying to. And that was brought up at the hearing? Yes, your honor. Well, it was brought up later, once the next counsel, Ms. Edwards, took the case, and she conferred with the clients, and then she filed a FOIA request, and she got the entire record. That's when we brought also the ineffective assistant of counsel in this case, which strongly prejudiced Mr. Bandari. Do I reserve some time for rebuttal? You don't have any time. You're minus. It's all right. Why don't you have a seat? Thank you. May it please the court, my name is Dara Smith, and I represent the United States government. The government respectfully requests that this court deny Mr. Bandari's petition for review because the record does not compel the conclusion he established eligibility for asylum, withholding of removal, or protection under the Convention Against Torture, and because the board did not abuse its discretion by denying his motion to reopen based on ineffective assistance of counsel. Well, can I ask you something? My notes show, maybe you have information that contrary, that Vinnie Guppa is not licensed to practice law in California. I'm not aware of his status, your honor. That's easy to find, you just call the state bar. And he's been, he's familiar to us because he's been the subject of more than one ineffective assistance of counsel claim. And we have one case called Singh versus Gonzalez, a 2007 case, and another 2008 case. And he was a petitioner, or he was the attorney in a case we heard in October, Singh versus Holder, and he filled out the asylum application incorrectly. Do you know of any of that information available to you? I'm sure it's available to the government, your honor. He practices law down in El Centro, and he goes into the detention center there. Do you know that? I'm aware of the detention center at El Centro, your honor. That he hangs out over there. I don't know anything about that. All right. To begin with the asylum application, I believe the changed circumstances issue has been discussed. So I'll go ahead and move on to withholding of removal if you don't have any questions about that. The record doesn't compel the conclusion that Mr. Bundari established either past persecution or a clear probability of future persecution because he was targeted based on extortion and not because of his political opinion or any other protected ground. There's a great deal of evidence in the record that the Maos targeted successful businessmen. And he said repeatedly in the record, for instance, at page 221 and page 246, that they target all businessmen. They target successful people who have money that they can give them. And when he talked about why he didn't give them money, he said, I wasn't able to give them money. If you give them money once, you have to give them money again. It seems to have been an economic issue primarily. The government doesn't contend that he wasn't involved in a political party or that he wasn't politically active in some way, but simply that the Maos didn't target him because of that political opinion. What he testified about in terms of what the Maos knew about his party was that they understood what the party did and they knew generally what was going on with it. He never testified that they knew anything about him specifically. And as far as the incident in which his bus was bombed, there's no indication that they knew that he owned the bus, let alone that that had anything to do with the political opinion, as Your Honor pointed out, that was during a transit strike. With respect to these transit strikes, part of the petitioner's case is that he was deprived economically of a way to make a living because of what the Maos did. But as he testified and as his brother-in-law testified, these transit strikes were countrywide. They weren't directed at him, and if he had trouble with his business, that was because any transit company would have trouble being in business in a country where there were frequent transit strikes. So in general, there's no indication in the record that it was his political opinion that the Maos targeted him for. As far as having a well-founded fear, I'm sorry, a clear probability of future persecution, there are indications that he didn't have anything to legitimately fear before he left, let alone now. For four years after his bus was bombed, he remained in Kathmandu. He continued to be asked for monies by the Maos, but nobody ever attacked him. If there were threats, they were toothless. No indication is that they ever intended to carry them out. So that does indicate that he didn't have a particular reason to believe that he's more likely than not to be targeted by them. He also continued to go back and forth to India without having any trouble during that time period. There is the fact that his fellow party members were killed, and that is relevant, but the only evidence in the record that they were killed by the Maos is that he believes that that happened, and he is presumed to be credible, so that can be taken into account. But when he talked about why he believes the Maos killed them, he says, maybe because they went against the party, maybe. That's the only evidence in the record whatsoever that indicates that those killings had anything to do with political belief whatsoever. As I understand it, Mr. Mandare testified that he intended to return to Nepal. He also sent his wife back there. What impact does that have on his statements about concerns about persecution? Well, he did testify that the reason he sent his family back to Nepal was because he didn't believe they would be at as great a risk, and that's worth considering. But he did come to the United States on a visitor's visa, and he said that he was intending to visit and to go back, and the petitioner's contention is that things changed, and that's why he didn't go back, and yet what he says his fear is based on are the events that happened before he came. So the government does not take the position that the board affirmed the subjective fear holding that the IJ made, but the objective clear probability standard is not satisfied in this case. Was he in detention during this entire period when the attorney visited him? I'm not aware of that, Your Honor. I know that at the time that he was on appeal, he was not detained. I mean, he was initially detained when he was arrested, but I'm not sure how long that period of detention lasted when he was first in communication with Mr. Gupta. So moving on to the torture convention analysis, what the immigration judge focused on was the fact that the people that he was afraid of, if indeed he had reason to believe that they were going to harm him at all, which the immigration judge had determined was not the case, that they were not agents of the government and there was certainly not government acquiescence as they were insurgents who were actively opposed to the government. So the petitioner has made some argument that there wasn't a thorough government acquiescence analysis, but there doesn't need to be a thorough analysis of why the government wouldn't be willfully blind in a situation when the people that he was afraid of were actively opposed to the government. The government was trying to stop them, and he in fact never asked the help of the government, so there's no way to know how they would have responded if that did happen. So the acquiescence analysis is as complete as it needed to be under the circumstances. There was no need to spend a great deal of time on that. And finally, with regard to the motion to reopen, it's the government's position that the board was within its discretion to deny the motion to reopen because there was no reasonable excuse for delaying as long as they did. And the petitioner correctly pointed out that it was a timely motion, so the due diligence analysis doesn't apply. But the board determined in its discretion that because Mr. Bandari was represented by the same counsel on his direct appeal and discovered the mistakes before the decision on the initial direct appeal, that the issue could have been raised earlier. Excuse me, I don't understand that. If there was a change in counsel, how was new counsel supposed to know that something went wrong the first time around? Your Honor, at the time that new counsel consults the client, mistakes can begin to arise. In fact, if you look at the notice of the deal... Yes, Your Honor. It's worth noting, however, that in the notice of appeal, which was filed by new counsel, that the issue of ineffective assistance is brought up. It wasn't argued before the board in the brief. But that is one of the extraordinary circumstances that was listed, and I'm not certain exactly how that would apply. But it does seem to indicate that new counsel was aware that there were problems with previous counsel as early as April. So although Petitioner has, again, correctly pointed out that not everything was crystal clear at that time and that they made more FOIA requests later and got more information at a later time, new counsel could have been aware and apparently was aware that there was a problem with previous counsel months in advance. So maybe it wasn't as clear as it could have been, but they would have noticed that that issue was going to arise and chose not to argue it before the board. Isn't there a real danger in filing something prematurely before you've got all the facts? Don't you risk an adverse decision simply because you didn't take the time to get all the facts? There is always a risk associated with choosing to file something at any particular time, but the board was within its discretion to determine that they had enough time to gather all the necessary facts. It certainly wasn't an arbitrary or irrational decision by the board that had a good reason for making that decision. Finally, on the issue of judicial notice, Your Honor has indicated correctly that the statute precludes inclusion of evidence that's outside the administrative record. GAFOR did find an exception to that. It specifically talked about this court's previous en banc decision in Fisher and found that this was an exception to the general rule of Fisher, specifically because of the circumstances. But what was not considered in GAFOR was the holding of Altowheel, which the GAFOR court could not overrule because it was only another three-judge panel. It didn't make an exception to the rule in Altowheel that the court can't remand a case to the board for the taking of additional evidence. It simply didn't mention Altowheel at all. So to the extent that this court could take judicial notice of whatever has happened in Nepal since the administrative record was closed or evidence that wasn't included in the record, the court can't remand to the BIA to look at it again and it can't make decisions in the first instance about asylum eligibility or about relief eligibility at all under INS v. Ventura. Did you say can or can't? Cannot make decisions in the first instance about eligibility based on new evidence. It would be appropriate for... Well, wouldn't they have to send it back to the board? Well, Your Honor, it's the government's position that it can do neither in this case because it can neither remand to the board to look at new evidence because it's statutorily precluded and because Altowheel determined that that statutory preclusion apply and it can't make that determination in the first instance. So there would be no reason to take judicial notice because this court is not empowered to do anything with that new evidence. So how does it get to the board? It could get to the board in a motion to reopen, Your Honor. That's the appropriate avenue for introducing new evidence, newly discovered evidence, changed country conditions. And a motion to reopen for changed country conditions is not... the numerical bar does not apply to that. So although he's filed a previous motion to reopen, he can file a new one based on current country conditions to offer to the board an opportunity to examine the situation now. And that would be the appropriate avenue for relief. So... Almost... I'm sorry, Your Honor. Yeah, almost start over in a sense. Right, that's right. It would be essentially a new asylum application based on new conditions. So if there are no further questions, then the government respectfully requests that this court deny the petition for relief. Thank you. Thank you. I will give you a minute. Counsel, I want to ask you, even assuming for a moment that the ineffective assistance of counsel was timely raised, what specifically do you allege that counsel did that was beyond the pale, that simply was malpractice, basically? Counsel did not properly build the record. Counsel only failed to appear even at the bond hearing of the petitioner, and counsel only met with the petitioner five minutes before the hearing. That would basically indict every public defender in Los Angeles County. But he was not a public defender. I understand that. But the reality is he did not malpractice in a setting like that to meet somebody five minutes before the hearing per se. I mean, there may be extenuating circumstances. But what in the record, what is not in the record that you would put in the record if counsel had done what you think counsel should have done? Counsel did not prepare the petitioner for the kind of questions he was going to face. Okay, but what would your client have testified if he had been properly prepared? Is there evidence of past persecution? What would that be? The petitioner would have testified that all of these actions taken together, the amount of the past persecution, and he would have testified better. He would have been better prepared to testify in spite of that fear. But what you're saying is that, you know, I don't see anything in the record that shows past persecution. Zero. Nothing. I'm interested to see if your client had been better prepared, what would your client have testified to? What's your proffer to what your client would have said that was not said? Our client would have testified that based on how the conditions are deteriorating in Nepal, that now more than ever he has a fear, a credible fear of returning there. And that's why he said he'd go back himself, and that's why he sent his wife back, right? Your Honor, with all due respect, that was testified to by his brother-in-law, and his brother-in-law later admitted that he was not being completely truthful. That is being imputed continuously to our client, but that was not our client's testimony. How did Gupta get to your client? We don't know, Your Honor. As was mentioned here, Mr. Gupta practices in the detention center of El Centro, and when people are detained in El Centro, typically, from what we understand, guards pass them cards of some attorneys. And as we can see, not all of these attorneys are good. In fact, as we heard, Mr. Gupta was involved in many cases of ineffective assistance of counsel. You didn't know that before you got here? I'm sorry, Your Honor? Did you know that before you got here? Yes, Your Honor, but, I mean, we don't want to beat a dead horse needlessly. Oh, that's a good idea. The record speaks for itself, Your Honor. I mean, we know it, everybody knows it. It's in the record. Okay. It's a public record. The horse is still dead. And how much time did Gupta spend with him? We don't know. We are not privy to that information, but from what we understood— You don't ask Gupta because you asked Gupta?  Well, just with it. Just with it. I'm sorry, how much time did Gupta spend with you? Just with it. And from what we could understand, not much time at all, and he wrote on a handwritten piece of paper some issues to be raised during the hearing. Okay. And did Gupta see your client before he met him, say, five minutes before they went into a hearing? Had he seen him in that interval? Gupta comes in to the detention center, takes a few notes, spends a little time, and then you say he came five minutes before the hearing. Had he spoken to your client in the interim? Well, I don't know the minute details of that, Your Honor. I wasn't there. I just asked you, did he speak—he saw your client here in the detention? But— Then you had the hearing here. Did he see him any time in between? I don't know, Your Honor, but that's certainly not how we prepare our clients for an asylum hearing, Your Honor. I know you're a good guy, but I'm asking you, but you don't know anything about that. I don't know, Your Honor. Because when you say he got there five minutes before the hearing, yeah, if an attorney is prepared to go and ready to proceed, then, you know, they're busy. They go from one place to another. But— No, Your Honor, what I meant was that the client said that he met with him only for five minutes before the hearing. Under Lozado, you have an obligation to get the response from Mr. Gupta. Did you do that? Right. We gave—we complied with all three prompts. We gave him the opportunity to respond. That's why it took time also. Did he respond? Yeah, he responded. And what did he say? Nothing of consequence. Nothing of consequence would exonerate him of his failure. What did he say? What did he say? That he did his best. That was Mr. Gupta's best, you know. One person's best while an attorney's best is not the other attorney's best. So he just wrote, I did my best, period. And at any point, did you make a proffer to anybody? The IJ, the BIA that indicates that had Mr. Gupta been a better lawyer, your client would have testified to A, B, C, D, E, N, E, which was not in here previously. Your Honor, that was implicit in our opening— No, it's not implicit. Under the law, you've got to indicate what it is that he did wrong. I see nothing in here that shows what he did wrong. Apparently, and I don't know whether your co-counsel was the one that saw this, but apparently at the time the BIA application was being prepared, there was an acknowledgment, a recognition that there were some mistakes that were made. Nothing was really said in any detail, but I don't find anything in the record here that specifies with any particularity what it is he did wrong. It's great to say he got ineffective assistance of counsel. Under Lozada, you've got to say why. Why he was ineffective, what it is, and the record that is missing. The list is very long, your Honor. What? He failed to show that he had a credible fear of returning to his country. He failed to claim changed country conditions, which would have waived the one-year deadline. He failed to signal him out as a person of a disfavor, as a prominent member of a disfavored group in Nepal. He failed to do any of that. The only thing that he did, he just repeated his client's... But all of that's in the record. All of that's in the record. Those claims are in the record. Yes. They weren't believed, but they're in the record. But they were not properly developed. They're in the record. They were not properly developed. The law was not properly argued. The case law, the precedents were not properly argued. And the record speaks for itself. That's why he was not... That's my point. The record speaks for itself. But I don't see anything here in the government's argument that is persuasive. And again, the government fails to state any type of binding law, precedents, or statute that would... in support of their position. And I think that it's pure speculation on part of my opposing counsel to say that our client was not personally targeted. And I would also like to bring to your Honor's attention that should Mr. Bhandari be compelled to return to his native Nepal now, he will be viewed as a westernized person and as a conspirator who remained in the United States all this time, because his Nepal, the Nepal that he left, is drastically different than the Nepal of today, where the Maoists and the Leninists are the government. They are part of the power. They are the power. There is no more kingdom. There is no more king. That's your new asylum application, isn't it? In a way, yes, Your Honor. But it was foreseeable. It was foreseeable. All these events. That's why we asked for that judicial notice to be taken of the country condition in 2005. It was foreseeable. All the events were leading to that. But counsel, there is nothing in this record that I'm aware of that shows where your client, based upon the things that occurred while he was in Nepal, was personally targeted for anything, other than the economic things, which happens in lots and lots of places. But there's no evidence of that. Well, there is going to be plenty of evidence, because at the time they were coming to power. At the time they were making an insurgency. Today they are the power. And today he's a class energy number one. But you have no evidence. It's mere speculation that your client will be targeted. You think he will be, but you have no evidence. No. It's mere speculation. All these persecutions taken together, and in that time in Nepal, and especially today, our client, as a prominent member of his favorite group, will be the first one to be targeted. And once again, we'll be happy to brief Your Honors on this issue. Okay. Now, I want to just ask you once more. I'm trying to refresh your recollection. If you talk to your client about this. You know, we have problems with appearance attorneys. Do you know what an appearance attorney is? Do you? An appearance attorney. An appearance attorney in the case on the merits, or in front of an IJ, or an appearance attorney? Would Your Honor be a little bit more specific? Well, if you don't know what an appearance attorney is, then you're living in the land of the innocents. So then I'm an innocent, too. I don't know what an appearance attorney is. Oh, okay. Well, it's good to have innocence. An appearance attorney is someone who gets to an immigration hearing a few minutes before the hearing takes place and has not really spent any time with a client at all until he gets, or she gets, to the hearing. You have described us a group, though. What? You have just described us a group, though. The world, the immigration world, is crawling with them. Huh? So, no, I didn't. Judge Holland is lucky because these appeals come right to the court of appeals. And I didn't know, when I was a district judge, I didn't know what an appearance attorney was. I thought it was someone who would groom their hair and comb their mustache before they went into an hearing. But it's all right. Read some of my footnotes and some of my cases, and I describe them for the erudition of the immigration bar.  Thank you, Your Honor. Godspeed. We'll go to four. United States v. Mitchell.
judges: Holland, Pregerson, Smith M.